CAFETERIA OPERATORS,
L.P., Appellant,

v.

Carole Keeton RYLANDER, Comptroller of Public Accounts; and John Cornyn, Attorney General of the State of Texas, Appellees.

No. 03–01–00447–CV.

Court of Appeals of Texas,
Austin.

Oct. 10, 2002.

Carroll Martin, Mark W. Eidman, Ray Langenberg, Scott, Douglass & McConnico, L.L.P., for appellant.

Blake A. Hawthorne, Asst. Atty. Gen., Taxation Div., Austin, for appellees.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and PURYEAR.

## ON MOTION FOR REHEARING

BEA ANN SMITH, Justice.

We withdraw our opinion and judgment of July 26, 2002, and substitute the following in its place. Cafeteria Operators runs a chain of cafeterias and buffet-style restaurants known as Furr's Cafeterias and Furr's Family Dining restaurants (Furr's). As a method of controlling costs and maintaining product uniformity, Furr's operates a central kitchen to service all of its restaurants. At the central kitchen, bulk food items are turned into the individual portions served at the restaurants. For example, large blocks of compressed frozen fish are sliced into fillets which are then buttered and breaded. Corn bread muffins are prepared in mass quantities. The food is then shipped to the individual restaurants, where it is heated and served.

To prepare this food, Furr's uses electricity and gas. After auditing the period from April 1, 1991, to October 31, 1994, the Comptroller assessed sales tax on the electricity and gas used in Furr's central kitchen. Furr's protested the assessment. A hearing was held before an administrative law judge who upheld the Comptroller's assessment. After a trial *de novo*,

the district court denied Furr's motion for summary judgment and rendered judgment in the Comptroller's favor on its cross-motion for summary judgment. In one issue on appeal, Furr's contends that the electricity and gas used in the central kitchen during the audit period qualified for exemption from sales tax. We will affirm the trial-court judgment.

## Discussion

### Electricity and Food

We cannot discuss the taxability of electricity under section 151.317 of the tax code in a vacuum; the evolving, if convoluted, provisions governing electricity and restaurants inform our discussion.[1] The predecessor version of the sales tax statute at issue in this case exempted gas and electricity from taxation when used "for processing tangible personal property for sale as tangible personal property." Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, sec. 151.317, 1981 Tex. Gen. Laws 1490, 1563–64. In the context of restaurants, under that version of the statute, the Comptroller exempted from taxation the electricity used in food preparation activities because it was considered used for "processing," while the electricity used for other activities in the restaurant was considered taxable. *See* Op. Tex. Att'y Gen. No. JM–756 (1987).[2] The statute was

---

1. During the period covered by the audit, section 151.317(a) read: "Gas and electricity are exempted ... except when sold for a commercial use." Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, sec. 151.317(a), 1981 Tex. Gen. Laws 1490, 1563. Section 151.317(c)(2)(A)(i) defined "commercial use" as not including use by a person engaged in processing tangible personal property for sale as tangible personal property other than preparation or storage of food for immediate consumption. Act of July 21, 1987, 70th Leg., 2d C.S., ch. 5, art. 1, pt. 4, § 25, 1987 Tex. Gen. Laws 1, 18–19. In 1999, section 151.317(a) was restructured to read affirmatively that gas and electricity are exempt when used for

a list of certain exempt purposes. Act of May 31, 1999, 76th Leg., R.S., ch. 1467, § 2.18, sec. 151.317(a), 1999 Tex. Gen. Laws 5017, 5017.

2. The Attorney General noted that many other states did not consider the use of electricity in food preparation as an exempt processing activity. The opinion also dealt with the Comptroller's ability to impose certain requirements on utility studies. Under the predominant use rule, electricity flowing through a single meter, but used for both exempt and taxable purposes, was not taxed proportionately. The predominant (more than 50%) use determined whether all of the electricity flow-

amended to eliminate the exemption for utilities used in "preparation or storage of food *for immediate consumption.*" Act of July 21, 1987, 70th Leg., 2d C.S., art. 1, pt. 4, § 25, 1987 Tex. Gen. Laws 1, 18–19 (emphasis added). Thus, electricity or gas used in the preparation of food for immediate consumption became taxable.[3]

Before this amendment in 1987, "food for immediate consumption" did not specifically govern the taxation of electricity, but the concept already existed to distinguish a tax exempt "food product" from taxable "food ready for immediate consumption." Tex. Tax.Code Ann. § 151.314 (West 2002).[4] Under section 151.314, food products for human consumption are tax exempt. *Id.* § 151.314(a). "Food products" do not include items such as soft drinks or candy, or "[f]oods and drinks ... served, prepared, or sold ready for immediate consumption in or by restaurants, lunch counters, cafeterias ...." *Id.* § 151.314(c)(2), (c)(3). "Food for immediate consumption" is defined by rule as "the type of food, beverages, or meals normally prepared, served or sold by restaurants, lunch counters, cafeterias, etc., which, when sold, require no additional preparation prior to consumption." 34 Tex. Admin. Code § 3.293(a)(9)(A) (2002) (Comptroller's Rule 3.293).

The same set of activities may in practice produce an edible substance that sometimes is classified as an exempt food product and sometimes is taxable as food ready for immediate consumption. For example, consider the activities that produce doughnuts. If sold in quantities of five or fewer by a retailer who provides eating facilities (tables, trays, chairs, benches or booths), those doughnuts are taxable food ready for immediate consumption. Comptroller Rule 3.293(a)(9)(B)(vi). If sold in a quantity of six or more, the same doughnuts become an exempt food product. Likewise, individual ice cream sundries are taxable as food ready for immediate consumption unless sold in a prepackaged unit containing six or more such items. Comptroller's Rule 3.293(a)(9)(B)(v), (C)(iv). Therefore, logically, the same set of physical activities could sometimes be "processing tangible personal property for sale as tangible personal property" and sometimes be preparing "food for immediate consumption," depending on how and where the food is sold.[5]

---

ing through that meter was exempt or taxable. 34 Tex. Admin. Code § 3.295(e)(1) (2002) (Comptroller's Rule 3.295). In practice, as noted in the motion for rehearing, that distinction caused a large expenditure of the Comptroller's time in analyzing elaborate utility studies of restaurants to determine the predominant use.

3. We observe that the language of the statute, "processing tangible personal property for sale as tangible personal property *other than* the preparation of food for immediate consumption" could be read as saying that preparation of food for immediate consumption is a form of processing, but a taxable form. However, the extensive use of the word "processing" makes for a confusing analysis, so we will consider "processing of tangible personal property" and "preparation of food for imme-

diate consumption" as two separate categories.

4. Section 151.317 uses the phrase "food for immediate consumption." Section 151.314 uses the phrase "food ready for immediate consumption." These phrases seem to be used interchangeably. The Comptroller's rule refers to "food ready for immediate consumption." 4 Tex. Admin. Code § 3.293 (2002) (Comptroller's Rule 3.293).

5. Furr's argues that section 151.317 does not define the words "food for immediate consumption" so we must give those words their plain meaning. Accordingly, it contends, frozen fish leaving their central cafeteria cannot possibly be food ready for immediate consumption. As noted above, the Comptroller does have a long standing rule defining, large-

Furr's operates cafeterias and has a central kitchen that prepares food exclusively for Furr's cafeterias. Furr's does not contend that its customers are not being served "food ready for immediate consumption." Furr's admits that the steps occurring inside each individual Furr's unit to heat and serve the food are taxable activities performed to prepare food for immediate consumption. However, Furr's asks us to draw a line at the kitchen door of each cafeteria and classify any steps performed elsewhere as an exempt activity, that is the processing of tangible personal property for sale as tangible personal property. We cannot ignore that the preparatory activities performed in the central kitchen produce food served at, and only at, Furr's cafeterias; those same activities could be performed in a kitchen physically attached to the serving line. To adopt Furr's analysis, we would have to classify a continuous stream of activities into two different kinds of activities based primarily on location. We believe that would contravene our holdings in *Texas Citrus Exch. v. Sharp*, 955 S.W.2d 164, 170–71 (Tex.App.–1997, no pet.), and *Rylander v. Haber Fabrics Corp.*, 13 S.W.3d 845, 850 (Tex.App.-Austin 2000, no pet.).

*Texas Citrus*

*Texas Citrus* involved a cooperative marketing association that produced fruit juice. In its manufacturing process, it extracted juice from the fresh fruit and then extracted the remaining water to obtain a thick, syrupy substance known as industrial concentrate. Texas Citrus next froze the concentrate, which was then sent to an off-site tank farm. The concentrate was maintained in its frozen state for up to six months in order to collect concentrate from various harvests with different acidity levels to be blended to achieve a uniform quality. *Id.* at 166. The Comptroller attempted to assess tax on the electricity used to maintain the concentrate in its frozen state, asserting that electricity used in "warehousing" was distinct from the exempt electricity used for processing tangible personal property. Texas Citrus contended that the maintenance of concentrate in its frozen state to achieve a proper blend was an integral part of its juice-manufacturing procedure. *Id.* at 167.[6]

This Court held that the manufacturing process includes every operation from the beginning of production until the product is completed and packaged for sale. *Id.* at 170. The opinion rejected the Comptroller's theory that the manufacturing process could be separated into discrete components, some taxable and some tax-exempt. Because the vast majority[7] of the frozen concentrate in the tanks was held for use in formulating Texas Citrus's main juice product, the electricity used to maintain the frozen concentrate was an

---

ly by example, what constitutes food for immediate consumption, which is not defined in its literal sense. The ordinary meaning of the words used in the statute would not seem to imply a distinction between five doughnuts and six in deciding whether those items are literally food ready for immediate consumption.

**6.** In its motion for rehearing, appellant complains that *Texas Citrus* involves "manufacturing" not "processing." As discussed in an attorney-general opinion, at one time the electricity exemption did not refer to "process-

ing." The Comptroller considered "manufacturing" to encompass "processing." *See* Op. Tex. Att'y Gen. No. JM-756 (1987).

**7.** A small amount of the frozen industrial concentrate was sold as concentrate. Under the predominant use rule, electricity flowing through a single meter, but used for both exempt and taxable purposes, was not taxed proportionately. The predominant (more than 50%) use determined whether all of the electricity flowing through that meter was exempt or taxable. Comptroller's Rule 3.295(e)(1).

essential part of the manufacturing process and was exempt from taxation. *Id.* at 170–71. Significantly, the opinion rejected the Comptroller's argument that the off-site location of the tank farm changed the nature of the activity from manufacturing to warehousing.

■ This Court applied a similar analysis in *Rylander v. Haber Fabrics Corp.*, 13 S.W.3d at 850, in which we held that the Comptroller cannot divide a production stream into component parts and examine each in a vacuum. One must look to see whether a function is a "reasonable continuum from start to finish" in deciding the taxable nature of the activity. *Id.* In that case, we concluded that the activities performed by the taxpayer, a series of manipulations to transform fabric of varying qualities into uniform rolls of first quality fabric, were all part of a tax-exempt manufacturing process. *Id.*

■ Applying our analysis in *Texas Citrus* and *Haber* to the facts of Furr's operations, we hold that Furr's engages in the taxable activity of preparing food for immediate consumption in its central kitchen, as well as in its restaurants.[8] The steps it takes in the central facility are part of the continuum of events that Furr's performs to prepare food to be served and consumed in its restaurants. That the initial steps of food preparation are performed at an off-site central location does not alter the continuous nature of the activity, just as holding the frozen concentrate in off-site

tanks in *Texas Citrus* did not remove that activity from the manufacturing stream.

We note that no significant food product prepared in Furr's central kitchen is retailed for home preparation. It is all prepared for immediate consumption by Furr's cafeteria customers. If Furr's had only one cafeteria and performed all the food preparation in a kitchen at that location, the electricity used in preparing food for immediate consumption would be taxable. It is immaterial whether Furr's transports a fish fillet from a walk-in freezer on the premises to its deep-fat fryer ten feet away or transports that piece of frozen fish to be fried in a kitchen several hundred miles away. Location does not alter the activity of preparing food for immediate consumption.

In *Texas Citrus*, this analysis of whether the taxpayer's activities were a "reasonable continuum from start to finish" resulted in the conclusion that the electricity used at the tank farms was part of the exempt manufacturing of tangible personal property. In the current case, it results in the conclusion that the electricity and gas used in the central kitchen constitutes the taxable use of electricity in preparing food for immediate consumption.[9]

### Conclusion

We hold that the that the electricity and gas used in Furr's central kitchen are being used for the taxable purpose of prepar-

---

8. As with the Texas Citrus Exchange's sale of a *de minimus* amount of the frozen concentrate, Furr's sells a small amount of the items leaving the central processing facility.

9. Furr's contends that the Comptroller's reliance on its "single entity" theory to assess tax in these circumstances violates the Comptroller's own "single meter" rule. We have not relied on the single entity theory and our holding does not implicate the "single meter" or "predominant use" rule: "Natural gas or

electricity used during a regular monthly billing period *for both exempt and taxable purposes* under a single meter is totally exempt or taxable based upon the predominant use of the natural gas or electricity measured by that meter." *See* Tex. Admin. Code § 3.295(e)(1) (2001) (emphasis added). Furr's never established that a single meter at any location measured electricity and gas used for both an exempt and a taxable purpose.

ing food for immediate consumption. We overrule Furr's single issue and affirm the trial-court judgment.